UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WANJUAN MEDIA (TIANJIN) CO., LTD. a.k.a. PILOT FILM AND TELEVISION MEDIA (TIANJIN) CO., LTD.,

Plaintiff,

-v-

AMAZON.COM, INC., AMAZON.COM SERVICES LLC, and "JOHN DOES' 1-5,

Defendants.

22-CV-1434 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

Plaintiff Wanjuan Media (Tianjin) Co., Ltd. ("Wanjuan") brings this action against Defendants Amazon.com, Inc. and Amazon.com Services LLC (collectively, "Amazon") for copyright infringement. Wanjuan is a joint copyright holder in "General and I," a Chinese historical television drama. Wanjuan asserts a single claim of infringement under the Copyright Act, alleging that Amazon streamed the show on its Prime Video service without a license or authorization from Wanjuan. The parties have cross-moved for summary judgment on this claim. For the reasons that follow, Amazon's motion for summary judgment is granted, and Wanjuan's motion for summary judgment is denied.

## I.    Background

### A.    Factual Background

The following facts are drawn from Defendants' Local Rule 56.1 Statement (ECF No. 42 ("Defs.' SOF")), Plaintiff's Opposition to Defendants' Local Rule 56.1 Statement (ECF No. 54-1 ("Pl.'s SOF Opp.")), Plaintiff's Local Rule 56.1 Statement (ECF No. 55-1 ("Pl.'s SOF")), Defendants' Opposition to Plaintiff's Local Rule 56.1 Statement (ECF No. 58-1 ("Defs.' SOF

Opp.")), and the underlying evidence cited therein.  The facts recited here are undisputed unless otherwise noted, and they are construed in the light most favorable to the non-movant.

Wanjuan, formerly known as Pilot Film and Television Media (Tianjin) Co., Ltd. or Paile Film and TV Media (Tianjin) Co., Ltd., is a television production and distribution company based in Tianjin, China.  Amazon.com Services LLC operates Prime Video, an online platform that streams both original content and content licensed from third parties, such as movie studios.  Prime Video also allows Prime members to subscribe to third-party premium channels, like Max and Showtime, through their Prime membership.

On or about April 22, 2015, Wanjuan entered into a "TV Series Joint Production Agreement" ("Joint Production Agreement") with another Chinese company, Shanghai Croton Culture Media, Co., Ltd. ("Croton Culture"), to produce a Chinese language television show called "General and I."  Under the Joint Production Agreement, Wanjuan and Croton Culture are the co-owners of the copyright to "General and I."

Wanjuan alleges that, on or about February 18, 2016, it entered into a Joint Distribution Agreement regarding "General and I" with Croton Culture and Shanghai Croton Film and TV Media Co., Ltd. ("Croton Film and TV").  (Pl.'s SOF ¶ 6.)  Amazon disputes that the Joint Distribution Agreement is valid, alleging that it was never executed by all parties and therefore remains void.  (Defs.' SOF Opp. ¶ 6.)

Wanjuan alleges that under the Joint Distribution Agreement, Croton Culture transferred all its rights in "General and I" to Croton Film and TV.  (Pl.'s SOF ¶ 8.)  Amazon likewise disputes the validity of the transfer agreement on the ground that the Joint Distribution Agreement was never executed by all parties.  (Defs.' SOF Opp. ¶ 8.)  Under the terms of the Joint Distribution Agreement, Wanjuan and Croton Film and TV are jointly responsible for the

distribution of "General and I," with Croton Film and TV having responsibility for streaming

platforms and overseas media, and Wanjuan having responsibility for traditional television

stations.  Wanjuan alleges that Croton Film and TV further transferred its rights in "General and

I" to another company called Horgos Croton Culture Media Co., Ltd. ("Horgos Croton")

sometime before March 7, 2016.  (Pl.'s SOF ¶ 11.)  Amazon disputes that this transfer occurred.

(Defs.' SOF Opp. ¶ 11.)  "General and I" was first publicly released in China in January 2017.

(Pl.'s SOF ¶ 17.)

In November 2017, Amazon and DramaFever Corp., a video streaming platform

specializing in Asian programming and owned by Warner Bros., launched a channel on Prime

Video called "DramaFever Premium."  (Defs.' SOF ¶ 5.)  Under the terms of an agreement

between Amazon and DramaFever, the parties agreed that DramaFever would provide notice of

new titles available on DramaFever Premium through an "avails notice" identifying the name,

availability dates, availability territories, and other metadata for each newly added program.  (*Id.*

¶ 9.)

In December 2016, Croton Culture and DramaFever executed an agreement through

which Croton Culture granted DramaFever non-exclusive "[o]nline distribution rights [of

'General and I'] on DramaFever Platforms with sublicense/redistribution rights (e.g., Hulu,

Netflix, iTunes, Amazon)."  (Pl.'s SOF ¶ 13.)  The parties expressly recognized "Amazon

Prime" as one of the platforms on which DramaFever would have the rights to distribute and

sublicense "General and I."  (*Id.* ¶ 14.)

In December 2017, DramaFever provided an "avails notice" to Amazon that it had added

"General and I" to DramaFever Premium, and the show became one of thousands of titles

available to be streamed on the channel at the time.  (*Id.* ¶ 15.)  In October 2018, Warner Bros.

3

instructed Amazon to shut down DramaFever Premium.  (*Id.* ¶ 18.)  According to Amazon, following Warner Bros.'s instructions, Amazon discontinued DramaFever Premium and permanently disabled access to video content previously available through the channel, including "General and I," in October 2018.  (Defs.'s SOF ¶ 19.)  Wanjuan disputes that Amazon discontinued streaming of the show in October 2018, contending that certain screenshots and other evidence "suggest that it is possible that Amazon was still streaming" the program in November 2020, and even perhaps "as late as October 2021."  (Pl.'s SOF Opp. ¶¶ 19-20).  It is undisputed, however, that Wanjuan's corporate representative was not able to watch the show on Prime Video in 2019 or later.  (*Id.* ¶ 20.)  It is also undisputed that even after "General and I" may have been no longer available to stream on Prime Video, Amazon maintained the historical catalog product detail page for "General and I."  (*Id.* ¶ 22.)  Screenshots of the product detail page include images and plot descriptions from the 62 episodes of "General and I," but each episode listing also contains the indication that "[t]his video is currently unavailable."  (ECF No. 54-7.)

On September 17, 2021, Wanjuan's attorneys sent a cease-and-desist letter to Amazon, requesting that Amazon remove or disable access to "General and I."  (Pl.'s SOF ¶ 22; Defs.' SOF Opp. ¶ 22.)  On October 4, 2021, Amazon replied by email to Wanjuan's attorneys, stating: "Following your Notice of Copyright Infringement dated September 17, 2021, this message is to inform you that as of October 4, 2021, the title: ["General and I"] is no longer available to stream, rent or purchase on Prime Video."  (Pl.'s SOF ¶ 23; Defs.' SOF Opp. ¶ 23.)  According to Amazon, it confirmed to Wanjuan that it had taken down the product detail page for "General and I" on October 4, 2021, but Wanjuan contends that "[i]t is unclear from Amazon's email"

whether Amazon took down the product detail page for the show or disabled streaming access to the show on that date.  (Defs.' SOF ¶ 30.)

## B.    Procedural History

On February 22, 2022, Wanjuan filed its complaint asserting one claim of copyright infringement against Amazon for streaming "General and I" on its Prime Video service without Wanjuan's authorization.  (ECF No. 1.)  Wanjuan subsequently filed an amended complaint on May 19, 2022 (ECF No. 19), and Amazon filed its answer on June 2, 2022 (ECF No. 20). Following the close of discovery, Amazon filed a motion for summary judgment on March 14, 2023 (ECF No. 40), and Wanjuan filed its cross-motion for summary judgment on April 21, 2023 (ECF No. 55).

## II.    Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party.  *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

"On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense."  *Cohen Lans LLP v. Naseman*, No. 14-CV-4045, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence."  *Clopay Plastics Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12-CV-5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept.

18, 2014).  The court views all "evidence in the light most favorable to the non-moving party,"

and summary judgment may be granted only if "no reasonable trier of fact could find in favor of

the nonmoving party."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (second quoting *Lund's,*

*Inc. v. Chem. Bank*, 870 F.2d 840, 844 (2d Cir. 1989)).

## III.     Discussion

Wanjuan brings a single claim of copyright infringement.  The Court first addresses the

statute of limitations, holding that the suit is timely.  The Court then addresses the infringement

claim, holding that Amazon is entitled to summary judgment in its favor.  Finally, the Court

addresses Wanjuan's request for leave to amend its First Amended Complaint, denying leave to

amend based upon Wanjuan's undue delay and the resulting undue prejudice to Amazon.

### A.     Timeliness

As a threshold matter, the Court addresses Amazon's argument that Wanjuan's claim is

untimely.  Amazon argues that because the streaming of "General and I" ended more than three

years before Wanjuan filed suit, the statute of limitations bars Wanjuan's claim.  Wanjuan

responds with several arguments.  Most relevant here, Wanjuan contends that although the

Copyright Act may limit *damages* to the three years prior to the suit, Second Circuit precedent

permits copyright *claims* to be brought up to three years after the discovery of infringement.

Wanjuan alleges that it did not discover Amazon's infringement until May 2021, which was less

than three years before it filed suit in February 2022.  Although Amazon urges the Court not to

"carve out a 'three-year limitation on damages' from the three-year statute of limitations" (ECF

No. 58 at 8), that is precisely what Second Circuit precedent requires.

The Copyright Act provides that "no civil action shall be maintained under the provisions

of this title unless it is commenced within three years after the claim accrued."  17 U.S.C.

§ 507(b).  In *Sohm v. Scholastic Inc.*, the Second Circuit reaffirmed its commitment to applying

the "discovery rule" to copyright cases.  959 F.3d 39, 50 (2d Cir. 2020); *see also Baron A.*

*Wolman Archives Tr. through Wareham v. Complex Media, Inc.*, No. 20-CV-152, 2022 WL

523597, at \*3 (S.D.N.Y. Feb. 22, 2022) (holding that in Copyright Act cases, "the discovery rule

is law in the Second Circuit, which recently reaffirmed its 'continuing propriety' in *Sohm*").

Under the discovery rule, "an infringement claim does not accrue until the copyright holder

discovers, or with due diligence should have discovered, the infringement."  *Sohm*, 959 F.3d at

50 (internal quotation marks and citation omitted).

Yet in *Sohm*, the Second Circuit also held that under the Supreme Court's interpretation

of the Copyright Act in *Petrella v. Metro-Goldwyn-Mayer*, *Inc.*, 572 U.S. 663 (2014), "a

plaintiff's recovery is limited to damages incurred during the three years prior to filing suit."

959 F.3d at 52; *see Petrella*, 572 U.S. at 677 ("[A] successful plaintiff can gain retrospective

relief only three years back from the time of suit.").  Accordingly, in copyright cases, the statute

of limitations and damages period are distinct.  Under *Sohm*, therefore, claims could arise that

are timely under the discovery rule but are nonetheless ineligible for damages.  Even though "a

number of courts outside the Second Circuit have rejected *Sohm*'s holding, . . . this Court is

bound to follow Second Circuit precedent."  *Hayden v. Koons*, No. 21-CV-10249, 2022 WL

2819364, at \*6 (S.D.N.Y. July 18, 2022).[1]  Because Amazon's argument erroneously depends

upon a three-year statute of limitations that runs from the time of injury rather than discovery,

Amazon has not met its burden of establishing that Wanjuan's claim is time-barred.

---

[1] The Court notes that the Supreme Court is currently reviewing the circuit split on the question whether the statute of limitations and damages period in Copyright Act cases run separately.  *See Warner Chappell Music, Inc. v. Nealy*, 144 S. Ct. 478 (Mem) (2023).  But until the Supreme Court clarifies the law on this issue, the Court is bound by the Second Circuit's precedent in *Sohm*.

Accordingly, the Court does not grant summary judgment to Amazon on the basis of the Copyright Act's statute of limitations.

### B.      Infringement

Having rejected the statute-of-limitations defense, the Court turns to the merits of Wanjuan's copyright infringement claim.  To prevail on this claim, Wanjuan must prove "(i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work." *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 51 (2d Cir. 2003).  The parties do not dispute that Wanjuan is a co-owner of the copyright to "General and I."  Instead, the cross-motions for summary judgment focus on the second element: whether Amazon engaged in unauthorized copying of the copyrighted work.  This issue, in turn, rests on two questions: whether Amazon had a valid license to stream "General and I," and if so, whether Amazon exceeded the scope of the license.

#### 1.      Validity of the License

"A valid license to use the copyrighted work immunizes the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor."  *Spinelli v. National Football League*, 903 F.3d 185, 197 (2d Cir. 2018) (citation and internal quotation marks omitted).  "The existence of a license is an affirmative defense, placing upon the party claiming a license the burden of coming forward with evidence of one."  *Id*. However, in cases where only the scope of the license is at issue, the copyright owner bears the burden of showing that a defendant's use of work exceeded the scope of the license.  *Id*.

The parties do not dispute that Croton Culture and DramaFever executed an agreement in December 2016 through which Croton Culture granted DramaFever non-exclusive online distribution rights to "General and I," with sublicense and redistribution rights to streaming platforms like Prime Video.  The parties also do not dispute that Amazon and DramaFever

8

entered into an agreement under which DramaFever would provide streaming content for the DramaFever Premium channel hosted on Prime Video.  Instead, Wanjuan contends that Croton Culture had no right to sign the December 2016 agreement and grant the license to DramaFever because Croton Culture had previously transferred all its rights to "General and I" to a different entity, Croton Film and TV, on February 18, 2016.  Wanjuan further alleges that Croton Film and TV, in turn, later transferred rights to "General and I" to Horgos Croton sometime before March 7, 2016.

The Court, therefore, must determine whether the February 2016 Joint Distribution Agreement effected a valid transfer of the rights to "General and I" held by Croton Culture to Croton Film and TV.  If it is a valid agreement, then Amazon's licensing chain is broken.  Amazon argues that the transfer agreement was never executed and is, by its own terms, void.  The Joint Distribution Agreement, in relevant part, provides: "This Agreement shall become effective when it is duly signed by the authorized signatories of Party A, Party B and Party C, and affixed with the seals of all the Parties."  (ECF No. 49-5 at 27.)  Under the agreement, Party A was Croton Film and TV, Party B was Paile Film and TV Media (Wanjuan's predecessor), and Party C was Croton Culture.  It is undisputed that although Croton Culture and Croton Film and TV both signed and affixed their seals to the agreement, Wanjuan only affixed its seal and never signed it.  Accordingly, Amazon argues that the agreement is void by its own terms and the transfer was never effected.  Wanjuan responds, citing U.S. case law and the Copyright Act, that its signature was unnecessary to execute a valid and enforceable copyright transfer between Croton Culture and Croton Film and TV.

To determine the validity of the Joint Distribution Agreement, the Court must predict how a Chinese court would rule on this question.  "Copyright is a form of property, and the usual

rule is that the interests of the parties in property are determined by the law of the state with 'the most significant relationship' to the property and the parties." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 90 (2d Cir. 1998) (citing Restatement (Second) of Conflict of Laws § 222).  Chinese law, therefore, is the appropriate source of law to determine the validity of a transfer of a copyright in a Chinese work from one Chinese company to another Chinese company.  *See id.*  Just as federal courts, sitting in diversity under *Erie*, must "carefully . . . predict how the highest court of the forum state" would rule, *Travelers Inc. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994), the Court here must predict how a Chinese court would apply Chinese law to this question.  "In determining foreign law, the court may consider any relevant material or source, . . . whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law."  Fed. R. Civ. P. 44.1

Article 142 of the Civil Code of the People's Republic of China governs the interpretation of disputed contractual terms.  Civil Code of the People's Republic of China art. 466 ("Where the parties have a dispute on the understanding of a contract clause, the meaning of the disputed clause shall be determined according to the provisions in the first paragraph of Article 142 of this Code.").  Paragraph 1 of Article 142 provides: "Where an expression of intent is made to another person, the meaning of the expression shall be interpreted according to the words and sentences used, with reference to the relevant terms, the nature and purpose of the civil juristic act, the custom, and the principle of good faith."  *Id*. art. 142.  Under this provision, the "literal wording of the disputed clause of the contract is the starting point" for interpretation and is accorded "undisputed prima facie priority" over the other interpretative factors listed in Article 142.  Yang Fan, *The Interpretation of Contract in Chinese Contract Law: A Comparative*

10

*Perspective*, in *Contents of Contracts and Unfair Terms* 30, 37 (Mindy Chen-Wishart & Stefan Vogenauer eds., 2020).

Accordingly, the Court takes as its starting point the literal wording of the contract. The Joint Distribution Agreement provides that it "shall become effective when it is duly signed by the authorized signatories of Party A, Party B and Party C, and affixed with the seals of all the Parties." (ECF No. 49-5 ¶ 15.7.) The literal wording of Paragraph 15.7 of the contract expressly and unambiguously requires the signatures and seals of all three parties for the agreement to be executed. Wanjuan has not offered any arguments, based on Article 142's interpretative factors, to support the view that the parties intended for the Joint Distribution Agreement to take effect with only the signature or the seal of all parties—or the signature and seal of only two of the parties—notwithstanding the literal wording of the agreement. On the contrary, evidence in the record demonstrates that when the parties, including Wanjuan, intended for an agreement to take effect with the signatures and seals of all parties, they expressly so provided in the text and executed the agreement accordingly. Three other agreements related to "General and I," to which Wanjuan was a party, required both the signatures and seals of all parties, and in all three cases, the parties executed the agreements with signatures and seals. (*See* ECF No. 49-4 ¶¶ 8-9; ECF No. 57-1 ¶ 14; ECF No. 57-3 ¶ 19.) In contrast, when the parties intended for a contract to be executed with either the signatures or seals of the parties, they expressly provided that the agreement would "become effective when it is affixed with the seals or duly signed by the Parties." (ECF No. 57-2 ¶ 7.5)[2] There is no evidence, based upon the purpose of the contract,

---

[2] Four out of the five parties to the September 28, 2017 settlement agreement related to "General and I" executed the agreement by only affixing their seals. (*See* ECF No. 57-2 at 19.) The fifth party executed the agreement with both a signature and a seal, but that fact does not contradict the parties' shared intention, as memorialized in the contractual text, to have the agreement take effect upon the signature or seal of all parties.

trade custom, or Article 142's other contextual factors, to override the literal and unambiguous

wording of the agreement.  The Court, therefore, concludes that because the Joint Distribution

Agreement was not signed and sealed by all parties as required by Paragraph 15.7, the Joint

Distribution Agreement is void under Chinese law and thus did not effect a valid transfer of

copyright.

Wanjuan's other challenges to the validity of Amazon's license to stream "General and I"

also fail.  Because United States law is irrelevant to the issue of the validity of the Joint

Distribution Agreement, Wanjuan's arguments, based on U.S. bankruptcy case law and the

Copyright Act, that its signature was not required for Croton Culture to transfer its copyright in

"General and I" to Croton Film and TV are unavailing.  Wanjuan also contends that the

December 2016 licensing agreement between Croton Culture and DramaFever is invalid because

it was not signed by both Wanjuan and Croton Film and TV, as required by the Joint Distribution

Agreement.  But this argument relies on the validity of contract language in the Joint Distribution

Agreement, which the Court has determined is void and unenforceable.  Wanjuan has also

offered no hard evidence to support its allegation that Croton Film and TV further transferred its

rights in "General and I" to Horgos Croton.

Accordingly, the Court concludes that Amazon had a valid license to stream "General

and I."  There is no dispute over the fact that Wanjuan did not sign the Joint Distribution

Agreement, and therefore, under Chinese law, there was no valid transfer of copyright from

Croton Culture to Croton Film and TV.  It is undisputed that Croton Culture and DramaFever

executed an online distribution agreement for "General and I," and it is also undisputed that

Amazon and DramaFever entered into an agreement to stream programing on DramaFever's

Prime Video channel.  Therefore, Amazon's licensing chain for "General and I" was unbroken.

##### 2.    Scope of the License

Having determined that Amazon had a valid license to stream "General and I," the Court now addresses whether Amazon exceeded the scope of that license.  It did not.  There is no genuine dispute over the fact that "General and I" was available for streaming on Prime Video between December 31, 2017, and October 31, 2018, when Warner Bros. shut down all DramaFever operations.  (*See* ECF No. 41 at 8-9; ECF No. 43-1 at 70:24-71:6, 72:20-73:6.)  Amazon's internal records of streaming video data on its Prime Video platform confirm the streaming dates of "General and I."  (ECF No. 43-1 at 70:1-23.)

Wanjuan suggests that Amazon could have continued to stream "General and I" as late as 2021, but even viewing the evidence in the light most favorable to Wanjuan, the Court concludes that Wanjuan's evidence is purely speculative and does not create a genuine dispute over the streaming dates.  *See D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."); *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("To defeat summary judgment, . . . nonmoving parties must do more than simply show that there is some metaphysical doubt as to the material facts, and they may not rely on conclusory allegations or unsubstantiated speculation.") (internal quotation marks and citations omitted).

First, Wanjuan argues that screenshots of the product detail page for "General and I" showing customer reviews and comments dated as late as November 2020 "suggest that it is possible Amazon was still streaming 'General and I' at the time when the customers made these comments on Prime Video's website."  (ECF No. 54 at 11.)  But the record makes clear that Amazon users may continue to review and comment on a show even if it is no longer available on Prime Video, and Wanjuan's contention is little more than fanciful speculation.

Second, Wanjuan argues that Amazon's response to its cease-and-desist notice creates "a question [of] when Amazon ceased streaming the 'General and I.'" (ECF No. 54 at 11-12.) In its email response to Wanjuan's letter on September 17, 2021, Amazon stated: "[T]his message is to inform you that as of October 4, 2021, the title ['General and I'] is no longer available to stream, rent or purchase on Prime Video." (Pl.'s SOF ¶ 23.) Once again, Wanjuan offers nothing more than unsubstantiated speculation, as the record makes clear that Amazon sent the email to notify Wanjuan that it had taken down the show's product detail page in response to the notice. (*See* ECF No. 58 at 6.) There is no hard evidence that Amazon streamed the show after October 2018 or that it discontinued streaming only after Wanjuan's cease-and-desist notice. Screenshots of the "General and I" product detail page, taken on August 3, 2021, and submitted into the record by Wanjuan, clearly indicate that "[t]his video is currently unavailable." (ECF No. 54-7 at 7-15.) Wanjuan's corporate representative also admitted to not being able to watch the show on Prime Video in 2019 or later. Wanjuan has offered no actual evidence to support the view that Amazon continued streaming the show when Warner Bros. shut down DramaFever in October 2018. The Court, therefore, determines that no rational factfinder could conclude that Amazon continued streaming beyond October 2018. Accordingly, the Court concludes that Amazon did not exceed the scope of its license.

The undisputed evidence demonstrates that Amazon had a valid license to stream "General and I" and did not exceed the scope of the license. Therefore, Amazon is entitled to summary judgment on the claim of copyright infringement, and the Court will deny Wanjuan's cross-motion for summary judgment on the claim.

### C.      Leave to Amend the Complaint

Also pending before the Court is Wanjuan's motion for leave to amend its complaint for a second time to assert a new claim: copyright infringement based solely on Amazon's display of

images from episodes of "General and I" on the show's product detail page.  This is a new theory that Wanjuan failed to plead in its First Amended Complaint and raises for the first time in its summary judgment briefing.  Wanjuan's pleadings alleged that Amazon's streaming of the show was the act of infringement (*see* ECF No. 19 ¶¶ 19-22), and its First Amended Complaint asserted that Amazon was "liable for copyright infringement of Plaintiff's exclusive right of reproduction and distribution under 17 U.S.C. § 106" (*id*. ¶ 31).  More precisely, Wanjuan's infringement claim, as pleaded, arises under 17 U.S.C. §§ 106(1) and (3), which protect the rights to reproduce and distribute copyrighted work.  The right to "display" "individual images for a motion picture or other audiovisual work" arises under a different provision, 17 U.S.C. § 106(5), and Wanjuan's pleadings neither allege a violation of the right of display nor cite the relevant provision.  Accordingly, the Court concludes that no reasonable reading of the First Amended Complaint supports the theory of infringement by the display of images alone.

Federal Rule of Civil Procedure 15 governs a motion to amend a complaint.  Rule 15(a)(2) provides that leave to amend a complaint shall be "freely" given when "justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, "it is within the sound discretion of the district court to grant or deny leave to amend."  *Barbata v. Latamie*, No. 11-CV-7381, 2012 WL 1986981, at *2 (S.D.N.Y. June 4, 2012) (quoting *Green v. Mattingly*, 585 F.3d 97, 104 (2d Cir. 2009)).  The Supreme Court has directed courts to grant leave to amend under Rule 15 in the absence of factors "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200-01 (2d Cir. 2007).

The Court denies the motion to amend based upon Wanjuan's undue delay and the resulting undue prejudice to Amazon.  The record evidence makes clear that Wanjuan had screenshots of the product detail page, including images from episodes of "General and I," in August 2021 (*see* ECF No. 54-7 at 3), yet Wanjuan failed to plead this theory in either its initial complaint filed on February 22, 2022 (ECF No. 1) or its First Amended Complaint filed on May 19, 2022 (ECF No. 19).  Wanjuan also failed to move to amend the complaint by the August 4, 2022 deadline set by the Court (*see* ECF No. 28 at 1) or to seek amendment of the Court's scheduling order pursuant Federal Rule of Civil Procedure 16(b)(4).  The record makes clear that Wanjuan had all the facts necessary to support this theory of infringement and, thus, acted with undue delay in raising the theory for the first time on summary judgment.  The Court also determines that allowing amendment for this new legal theory, over a year after the close of discovery, would result in undue prejudice for Amazon.  Allowing amendment at this late stage would cost Amazon additional resources and delay resolution of this dispute, even though Wanjuan had all the relevant facts at the outset.  Accordingly, based on these considerations, the Court exercises its discretion and denies Wanjuan's motion to amend.[3]

## IV.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. Plaintiff's motion for summary judgment is DENIED.  Plaintiff's motion for leave to amend is also DENIED.

The Clerk of Court is directed to close the motions at ECF Nos. 40, 48, 55, and 56.

---

[3] The motions to seal at ECF Nos. 48 and 56 are granted.

The Clerk is also directed to enter judgment in favor of Defendants and, upon entry of judgment, to close this case.

SO ORDERED.

Dated: March 8, 2024
New York, New York

_____
J. PAUL OETKEN
United States District Judge

17